* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms in part and modifies in part the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. The parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. On July 23, 2002, plaintiff sustained a compensable injury to his eye while employed by defendant-employer.
3. Plaintiff's average weekly wage is $411.60, which yields a compensation rate of $274.40 per week.
4. The following exhibits were admitted into evidence at the Deputy Commissioner's hearing:
 a. Exhibit 1: Executed Pre-Trial Agreement
 b. Exhibit 2: Medical records (including those of Dr. Kenny Hefner and the IME report from Dr. Scott J. Spillman, both provided post-hearing)
 c. Defendants' Exhibit 1: Plaintiff's employment application with defendant-employer
 d. Defendants' Exhibit 2: Plaintiff's "Acknowledgement of Receipt" of defendant-employer's "Company Policy"
 e. Defendants' Exhibit 3: Page from defendant-employer's "Safety Policy Manual"
 f. Defendants' Exhibit 4: "Weekly Reports" for plaintiff's work crew for weeks ending 6/4/04 through 8/27/04
5. The issues before the Full Commission are whether plaintiff is entitled to temporary total disability compensation from August 10, 2004 and continuing; whether plaintiff is entitled to payment of all related medical expenses; whether plaintiff is entitled to permanent *Page 3 
partial disability compensation; and whether plaintiff is permanently and total disabled from work.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 49 years old and had a high school education. Plaintiff has been virtually blind in his right eye since his youth due to an amblyopic condition from which no recovery is expected. He had also suffered from severe, chronic hip and back pain for approximately 12 years prior to the date of his compensable injury. Plaintiff does not allege that his right eye condition and his hip and back conditions are related to his employment with defendant-employer.
2. Plaintiff has worked for defendant-employer for approximately two years as a laborer on a buried cable crew. On July 23, 2002, plaintiff was getting supplies out of a truck when a bungee cord that secured a water cooler in the truck snapped loose, whipped around, and struck plaintiff in the face. Due to the impact, the lens in plaintiff's glasses broke and plaintiff sustained a laceration to his left cornea.
3. Following an initial visit to a hospital emergency room, plaintiff presented to Dr. John G. Oliver, an ophthalmologist, for further treatment. On July 25, 2002, Dr. Oliver diagnosed plaintiff with a partial thickness corneal laceration through his visual field. Dr. Oliver continued to treat plaintiff over the next three and a half months. During this time, plaintiff complained of severe headaches in the area over his left brow, blurred vision in his left eye, horizontal diplopia, and pain and photosensitivity in his left eye. On September 3, 2002, Dr. Oliver *Page 4 
noted that the laceration was healing. Dr. Oliver referred plaintiff to Dr. Keith A. Walter with Wake Forest University Eye Center.
4. On August 16, 2002, plaintiff presented to Dr. Walter, who noted that plaintiff had sustained a laceration to cornea at a depth of 80 percent. Dr. Walter followed plaintiff for the next 11 months.
5. On May 23, 2003, Dr. Walter noted that plaintiff's corneal laceration had healed, leaving a linear scar about 4.5 millimeters long that was near but mostly out of the visual axis of plaintiff's left eye. Dr. Walter recommended a contact lens for the eye rather than a corneal transplant. Dr. Walter also noted that, on May 1, 2003, plaintiff had an uncorrected visual acuity in his left eye of 20/80, and 20/60 with glasses. Dr. Walter noted that plaintiff could potentially get to 20/30 or 20/20 in his left eye with a contact lens. On July 25, 2003, Dr. Walter noted that plaintiff could go "back to work with either glasses or [contact lenses]." Dr. Walter indicated that, with correction, plaintiff could return to work "completely and fully . . . in any capacity" except for jobs that require binocular vision. Plaintiff has been unable to tolerate a contact lens because of the continued irritation he has experienced in his left eye.
6. On October 28, 2003, plaintiff presented to Dr. Scott J. Spillman for an independent medical examination. Dr. Spillman noted that plaintiff was not having any headaches and that plaintiff's left eye visual acuity without correction was 20/50, and 20/30 with his glasses. Dr. Spillman concluded that plaintiff's vision in his left eye, while wearing his glasses, was sufficient for him to drive and operate machinery. As such, Dr. Spillman concluded that plaintiff was "ready to return to [his previous] job pending his passing the company's competency test." Dr. Spillman also wrote that it was "imperative" that plaintiff wear high-impact protective safety glasses with side shield protection "whenever he is working." Dr. Spillman *Page 5 
found that plaintiff was at maximum medical improvement and assigned a ten percent permanent partial impairment rating to plaintiff's left eye.
7. In November of 2003, plaintiff returned to work with defendant-employer doing the same kind of work he was doing before his injury.
8. On February 24, 2004, plaintiff saw Dr. Oliver, who noted that plaintiff's left eye had been irritated and scratchy for the past month and had gotten worse over the previous four or five days. On April 23, 2004, plaintiff again saw Dr. Oliver, who noted that plaintiff was still experiencing light sensitivity, scratchiness and blurred vision in his left eye.
9. On July 9, 2004, plaintiff presented to Dr. Timothy Martin, a neuro-opthalmologist, for an evaluation to determine whether there were some other cause, besides the corneal laceration, for plaintiff's continued blurred vision, photosensitivity and discomfort. Dr. Martin determined that there was no additional diagnosis beyond the corneal scar and concurred with Dr. Walter's recommendation that plaintiff continue using artificial tears. Dr. Martin noted that plaintiff stated that he could drive safely during the daytime. Dr. Martin also noted that plaintiff could achieve uncorrected visual acuity of 20/30 in his left eye with squinting.
10. From November of 2003 through August 10, 2004 during the period of plaintiff's return to work, plaintiff saw his personal physician, Dr. Kenny Hefner, seven times. These appointments were for problems related to bronchitis, low back pain and digestive system upset.
11. In March 2004, plaintiff was referred to Dr. Bobby Kearney, anesthesiologist and pain management specialist, for non-work-related low back pain, right leg pain, and right hand pain. Plaintiff stated that his pain had kept him out of work. Dr. Kearney felt plaintiff had some degenerative disc disease and findings of osteoarthritis. Dr. Kearney performed epidural steroid injections on plaintiff. Plaintiff last saw Dr. Kearney on April 30, 2004. At his deposition, Dr. Kearney *Page 6 
had no opinion regarding the source of plaintiff's chronic pain, his return to work status or his ability to work. One of his goals of treatment was to bring plaintiff to a more functional level; however, Dr. Kearney testified that he was unable to help plaintiff's chronic pain improve.
12. From June 1, 2004 through August 10, 2004, plaintiff missed approximately 27 days of work. Defendant-employer's policy states that "Anyone missing excessive days from work, and does not provide his foreman or supervisor with a doctor's excuse, is subject to immediate dismissal." On August 10, 2004, plaintiff was terminated from his job with defendant-employer for failing to consistently provide doctors' notes to defendant-employer pursuant to their policy.
13. The Full Commission finds that plaintiff was terminated from his job with defendant-employer for fault unrelated to his compensable injury and for which a non-disabled employee would have been terminated. Furthermore, the Commission finds that any medical reasons that precipitated plaintiff's absences from work from June 1, 2004 through August 10, 2004 related predominantly to plaintiff's back pain, and were not related to his compensable injury.
14. Plaintiff testified that, since his termination, the only attempt he made to find work was with his brother-in-law in chicken houses. Plaintiff explained that he could not perform the chicken house job as he had previously because the dust irritated his eye and he got carsick on the ride to and from the jobsite. Plaintiff testified that, ". . . other than that, I haven't looked for work because I — there's no way I could — I could do anything." Plaintiff also felt that he could not direct traffic or operate a ditch witch because of his vision problems and safety concerns. *Page 7 
15. On June 27, 2005, plaintiff presented to Dr. William S. Atkins, an ophthalmologist, reporting that he had "a lot of headaches" and that the pain was usually centered over his left eye. Plaintiff did not complain of photosensitivity or blurred vision. Dr. Atkins found that plaintiff's corrected visual acuity in his left eye was 20/80, that plaintiff's left eye condition was stable, and that the only way to improve his left eye vision would be through a corneal transplant.
16. At his deposition, Dr. Atkins testified that it is typical for someone with a corneal scar like plaintiff's to experience blurred vision. He explained that corneal opacity, or clouding within the cornea or corneal scar, is the reason plaintiff does not see well out of his left eye. Dr. Atkins explained that plaintiff's headaches may not be related to the corneal scar, but could be related to squinting and photosensitivity. Dr. Atkins testified that plaintiff's dry eye, scratchiness, and irritation might be related to pinguecula, a condition unrelated to plaintiff's compensable injury. However, Dr. Atkins stated that plaintiff's pinguecula might affect his tolerance for contact lenses, which might improve and smooth plaintiff's cornea. If contact lenses were unsuccessful, plaintiff would require a corneal transplant; however, plaintiff is currently very stable. Regarding plaintiff's ability to work, Dr. Atkins stated, "It is difficult with his current condition to work well" and that plaintiff cannot get a driver's license.
17. Dr. Martin testified that he would not generally associate headaches with a corneal scar, and although a corneal scar could cause photosensitivity, squinting to counter the photosensitivity could cause muscle tension headaches. Dr. Martin testified that plaintiff's eye discomfort might be consistent with his corneal laceration and scarring but that he would defer to a cornea specialist. Dr. Martin explained that plaintiff's corneal scar would not disappear over time. Dr. Martin testified that it would be difficult for someone to work who had virtually no *Page 8 
vision in the right eye and 20/30 vision in the left eye with squinting, although plaintiff can drive. He felt it would be difficult to assess plaintiff's ability to perform his job and that he could not give a measure of what impact plaintiff's vision may have on his ability to work. He also stated that he would not disagree with Dr. Spillman that plaintiff could return to work without limitations. Dr. Martin also stated that he has no experience with disability ratings and that he would defer to Dr. Spillman on plaintiff's ten percent disability rating to the left eye.
18. The Full Commission finds that plaintiff has not shown that he is disabled because of headaches, photosensitivity or eye discomfort. The Full Commission finds that, based on plaintiff's wide range in visual acuity, the opinions of Dr. Walter and Dr. Spillman, and that Dr. Martin deferred to Dr. Walter's opinion regarding plaintiff's ability to work, plaintiff has not shown that he is disabled from earning wages due to a loss in visual acuity in his left eye, or that he has been disabled since August 10, 2004. Plaintiff failed to prove by the greater weight of the evidence that any inability to find work after his termination was causally related to his compensable injury by accident.
19. Dr. Spillman recommended and the Full Commission finds that tinted prescription high impact protective safety glasses with side shield protection are reasonably required to effect a cure and provide relief for plaintiff. Plaintiff also requires a continuing regimen of eye drops and other medications.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following: *Page 9 
 CONCLUSIONS OF LAW
1. On July 23, 2002, plaintiff sustained a compensable injury to his left eye arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. In order to meet the burden of proving continuing disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982).
3. On August 10, 2004, plaintiff was terminated for misconduct and fault, unrelated to his compensable injury, for which a non-disabled employee would ordinarily have been terminated by defendant-employer.Seagraves v. Austin Co. of Greensboro, 123 N.C. App. 228,472 S.E. 2d 397 (1996). Accordingly, plaintiff's termination constituted a constructive refusal of suitable employment. N.C. Gen. Stat. § 97-32;Id.
4. Under the Seagraves analysis, after an employer has proven that the employee's termination constitutes a constructive refusal of employment, an employee must then show that his inability to find other employment at wages comparable to those earned prior to the injury is due to the work-related disability. Seagraves v. Austin Co. of Greensboro,supra.
5. In the present case, plaintiff did not meet his burden to prove that after his termination on August 10, 2004, he was incapable of finding work because of his work-related injury. Plaintiff did not show that he was unable to obtain employment after a reasonable effort or that it was futile for him to seek employment because of other factors. Plaintiff was capable of some work and no doctor took him out of work.Demery v. Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993). Therefore, after August 10, 2004, plaintiff failed to prove that he was *Page 10 
disabled from employment due to the compensable injury and he is not entitled to any compensation. N.C. Gen. Stat. § 97-29; Seagraves v.Austin Co. of Greensboro, supra.
6. As a result of his injury by accident on July 23, 2002, plaintiff sustained a permanent injury to his left eye. Plaintiff did not sustain any injuries to his back. As a result of his left eye injury, plaintiff is entitled to a permanent partial disability rating of ten percent to the left eye. N.C. Gen. Stat. § 97-31(16).
7. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of his compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability, including treatment by Drs. Oliver, Walter, Spillman, Martin and Atkins, and treatment at the emergency room. Treatment may include diagnostic testing, referrals, and prescription and over-the-counter medications and drops. Plaintiff is also entitled to have defendants pay for tinted prescription high-impact protective safety glasses with side shield protection. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for temporary total disability and permanent total disability compensation must be, and hereby is, DENIED.
2. Defendants shall pay for all medical expenses incurred or to be incurred as a result of plaintiff's compensable injury, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's *Page 11 
period of disability, including treatment by Drs. Oliver, Walter, Spillman, Martin and Atkins, and treatment at the emergency room. Treatment may include diagnostic testing, referrals, and prescription and over-the-counter medications and drops. Defendants shall also pay for plaintiff's tinted prescription high-impact protective safety glasses with side shield protection. To the extent that plaintiff or any third-party payor has paid for any such treatment, defendants shall reimburse the payor in full.
3. Subject to a reasonable attorney's fee approved below, defendant shall pay plaintiff permanent partial disability compensation for the ten percent impairment to the left eye at the rate of $274.40 for 12 weeks. N.C. Gen. Stat. § 97-31(16).
4. A reasonable attorney fee of 25% of the compensation due plaintiff under paragraph 3 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel.
5. Defendants shall pay the costs, including but not limited to the following expert witness fees: $607.50, or the amount actually billed, whichever is less, to Dr. Martin, and $500.00 to Dr. Kearney
This 26th day of February, 2007.
 S/_______________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ DIANNE C. SELLERS COMMISSIONER
 S/___________ PAMELA T. YOUNG COMMISSIONER *Page 1